**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARGARET D. ENGLISH, Individually )
and as Personal Representative of )
The Estate of Michael English, Deceased, )
522 49th Street N.E. )
Washington, D.C. 20019 )
                                         )
             Plaintiff,                  )     Civil Action No. 14-1937
      v.                                 )     JURY TRIAL DEMANDED
                                         )
THE DISTRICT OF COLUMBIA,                )
   a municipal corporation               )
SERVE:                                   )
Office of the Attorney General           )
441 4th Street, N.W., Suite 800 South    )
Washington, D.C. 20001                   )
                                         )
and                                      )
                                         )
OFFICERS JOHN DOES 1 - 8,                )
                                         )
             Defendants.                 )

## COMPLAINT

Plaintiff Margaret English, individually, and as the Personal Representative of the

Estate of Michael English, by and through counsel, brings this action and states as

follows:

## JURISDICTION AND VENUE

1.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1331 based on

a federal question, 28 U.S.C. § 1343(a)(3) (civil rights), and 28 U.S.C. § 1367(a)

(supplemental jurisdiction).

2.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(1) because

Defendant, the District of Columbia, is a municipal corporation licensed to and doing

business in the District of Columbia.

3.      The decedent, Michael English ("Mr. English"), was a resident of the District of Columbia.  He died at age 22.  The Personal Representative of the Estate, Plaintiff Margaret English, is a resident of the District of Columbia.

4.      Officers John Doe 1 - 8 are corrections officers or other prison personnel who owed duties to Mr. English as set out in this Complaint.

5.      The District of Columbia Central Detention Facility ("CDF") and the Metropolitan Police Department ("MPD") both conducted thorough written investigations of the death of Mr. English. The CDF investigation and the MPD police report satisfy the notice requirement under D.C. Code § 12-309.

<u>**FACTS**</u>

6.      Until 2010, Mr. English was an ordinary, home loving, and studious young man with no criminal record.

7.       During 2010, Mr. English began to show signs of mental illness while he was a college sophomore at Lincoln University in Pennsylvania.

8.      Concerned about his changing mental state, Mr. English met with a school counselor.

9.      By the beginning of 2011, Mr. English's mental instability intensified.  He began to suffer from paranoia and would confine himself to his room for long periods.

10.      In 2011, Mr. English withdrew from Lincoln University and went to live with his mother in Richmond, Virginia.

11.      In 2011, concerned about his well-being, the English family hospitalized Mr. English at George Washington University Hospital ("GWUH").  At GWUH, Mr. English was diagnosed with paranoid schizophrenia.  Health care providers informed the

family that paranoid schizophrenia commonly manifests in males of the same age as Mr. English.

12.     At GWUH, doctors prescribed medication to treat Mr. English's mental condition.

13.     In 2011 and early 2012, Mr. English presented to Seton House, a mental health facility at Providence Hospital, for further inpatient care of his mental illness.

14.     After suffering a paranoid delusion in May 2011, Mr. English told his mother that he may have had inappropriate contact with a family member.  Given his whereabouts at the time of the delusion, it was unlikely that Mr. English could have had such contact.

15.     Nonetheless, the family reported the incident to authorities and Mr. English spent time at the CDF.  During this brief incarceration, Defendants became aware of Mr. English's mental illness.

16.     In August 2011, several of Mr. English's family members, including English's father, William English, wrote a letter to a Superior Court Judge requesting that in light of this incident the District provide Mr. English with needed mental health services and for "a safe environment to start addressing his issues."

17.     Mr. English's probation officer told the court that "[t]his officer is extremely concerned about Mr. English's well-being, as well as the safety of the community."

18.     In February 2012, while suffering another paranoid delusion on the Metro, Mr. English believed that a Metro rider's umbrella was speaking to him.  Mr. English

took the rider's umbrella.  When Metro police questioned Mr. English, they found a knife in his possession.  Although Mr. English had not used the knife, he was arrested.

19.     As a result of this incident, Mr. English was sent to Western State Hospital in Staunton, Virginia.  He remained there for several months while he was treated for his mental illness.

20.     On October 30, 2012, during a schizophrenic episode Mr. English became involved in an altercation with a friend.

21.     As a result, the MPD arrested Mr. English and placed him at the CDF.

22.     Despite being aware of Mr. English's mental illness and his reliance on medication to control the disease, Defendants initially refused to provide Mr. English with his medication.

23.     Despite being aware of Mr. English's mental illness, Defendants refused family visits to Mr. English, who relied upon his family during mental-illness episodes.

24.     As one example of family attempts to visit Mr. English, Margaret English made multiple online appointments to visit her son at CDF, all of which were rejected.

25.     Ms. English also called the CDF on multiple occasions seeking to visit her son.  Each time she was told she could not see him because of "behavioral reasons."

26.     Around the time of his pretrial hearing, Mr. English's attorney, Russell Bikoff, Esq., filed a medical-alert form alerting officials of Bikoff's concerns about Mr. English's mental illness and his overall well-being at CDF.

27.     Several weeks after his arrest, Mr. Bikoff or his agent spoke with Bruce Reid.  Mr. Reid was the mental-health director for Unity Health Care, a contractor at

CDF.  During this conversation, Reid was specifically informed of Mr. English's mental illness and his poor well-being at CDF, and was asked to look into the situation.

28.     Mr. Reid responded that CDF/Unity would look into the situation.

29.     After allegedly throwing an unknown substance at a guard, Defendants placed Mr. English in the South One Housing Unit, a Special Management Unit for inmates that require a higher degree of care and supervision for behavioral issues.

30.     At some point, Defendants placed Mr. English on "Behavioral Observation."

31.     Throughout his incarceration, Defendants did not place Mr. English on suicide watch or utilize suicide precautions despite knowing that Mr. English was mentally ill and exhibiting dangerous signs.

32.     Throughout his incarceration Defendants only briefly placed Mr. English in a suicide-resistant cell.  Despite further exhibitions of abnormal and erratic behavior, Defendants placed Mr. English in a cell with a sheet and an anchoring device, which should not be used with mentally-ill inmates.

33.     Throughout his incarceration Defendants kept Mr. English in isolation.

34.     Throughout his incarceration Defendants failed to implement suicide-prevention mechanisms for Mr. English, such as removing items that could be used to commit suicide, providing proper treatment of his mental illness and allowing socialization with his family.

35.     On November 30, 2012, at approximately 2:36 p.m., a CDF employee found Mr. English unresponsive and hanging with a bed sheet tied around his neck.

36.     On November 30, 2012, Mr. English was pronounced dead at 3:49 p.m.

37.     On November 30, 2012, the South One unit logbook noted that security checks were performed on Mr. English's unit at 8:10 a.m., 8:32 a.m., 9:30 a.m., 9:49a.m., 11:00 a.m., 11:30 a.m., 12:02 p.m., 12:30 p.m., 1:02 p.m., 1:31p.m., and 2:00 p.m.

38.     All security check entries after 9:49 a.m. were fraudulent.

39.     The Office of Investigate Services ("OIS") reviewed the unit logbook and video footage of security checks performed on Mr. English's unit, and determined that no one performed a security check of Mr. English's cell after 10:00 a.m. on November 30, 2012.  In other words, no one checked on Mr. English from 10:00 a.m. until he was found dead, a period of over four hours.

40.     The unit log book also falsely noted that Mr. English made a telephone call on November 30, 2012.

41.     Mr.  English never made, nor was he allowed to make, any phone calls throughout his incarceration.

42.     On November 30, 2012, the Window and Bar check form noted that a security check was performed on Mr. English during the day shift.

43.     The OIS analysis of video footage revealed that no security checks were conducted that correlate with the log book, no phone call was made, and no windows and bar check was performed.

44.     On November 30, 2012, a Security Activity Record ("SAR") form was prepared by the unit officers.  A SAR form is unique to the Special Management Unit and is designed to document inmate behavior and the time of such behavior.

45.     According to the SAR form, Mr. English was "reading" at 2:38 p.m., 3:08 p.m., and 3:39 p.m.

46. The SAR is fraudulent as Mr. English was found unresponsive at 2:36 p.m. and was pronounced dead by 3:49 p.m.

47. According to the investigation, one of the John Doe Defendants admitted to fraudulently completing the form prior to the 3:00 p.m. unit count.

48. A South One Sergeant (and John Doe Defendant) further admitted that he was aware that officers "pre-recorded" observations on SAR forms.

49. The OIS investigation revealed that during a 2012 "Mock Audit" the South One unit Officers were not conducting thirty-minute rounds.

50. On November 30, 2012, the Zone One Supervisor (and John Doe Defendant) never entered the South One Housing Unit.

51. The OIS investigation reported that South One Unit Officers claimed they were inadequately staffed.

## COUNT I
### (NEGLIGENCE – ALL DEFENDANTS)

52. Plaintiff incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

53. Defendants owed a common-law duty for the safekeeping, care, and protection of inmates at CDF, including Mr. English.

54. Defendants had a duty to exercise reasonable care in performing these duties.

55. Defendants' duties included ensuring that CDF had appropriately-trained personnel and professionals to protect mentally-ill inmates, such as Mr. English.

56. Defendants owed a duty to ensure that all inmates undergo a mental-health screening during intake. Defendants owed a duty to ensure that inmates exhibiting signs

of potential suicidal or other unusual behavior undergo appropriate analysis.  Defendants owed a duty ensure that inmates exhibiting signs of potential suicidal behavior are treated with a heightened degree of care.

57.    Defendants' duties included the duty to appropriately monitor inmates generally and to more carefully monitor inmates showing unusual behavior and/or potential suicidal behaviors.

58.    Defendants' duties included the duty to log accurate information and observations of inmates so that behavioral changes and risky behavior could be efficiently managed.

59.    Defendants negligently breached their duty of care and protection and negligently provided substandard care to Mr. English in the following manners:

    a.   failing to properly provide Mr. English with medication for a serious and known mental illness;

    b.   failing to assess Mr. English's mental well-being in a reasonable and timely manner;

    c.   failing to place Mr. English in an appropriate cell;

    d.   failing to place Mr. English on suicide watch or on suicide precaution despite his known mental illness, erratic behavior and the Defendants' actual knowledge of Mr. English's condition;

    e.   failing to properly monitor and log observations of Mr. English;

    f.   failing to provide adequate medical care, adequate general care and an adequate care plan which would have prevented the reasonably foreseeable death of Mr. English;

g.  falsifying documents concerning how often Mr. English was being monitored by Defendant's staff;

h.  failing to follow accepted and standard medical procedures and safety methods when caring for and supervising Mr. English; and

i.  were otherwise negligent.

60.   As a direct and proximate result of the Defendants' negligence, Mr. English suffered injuries and death.

61.   As a direct and proximate result of the Defendants' negligence, Mrs. English and the next-of-kin beneficiaries have suffered, and will continue to suffer mental anguish, loss of society, companionship, guidance, kindly offices and advice, and the reasonably expected loss of income and services, protection, care and assistance provided by English, and all other damages recoverable under District of Columbia law.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in the amount of $5 million and for all other relief deemed just and proper.

## COUNT II
### (NEGLIGENT HIRING & RETENTION – DISTRICT OF COLUMBIA)

62.   Plaintiff incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

63.   The District of Columbia owed Mr. English the duty to exercise the degree of care, skill, and diligence ordinarily used by responsible detention centers in the hiring and retention of appropriate personnel.

64.   The District of Columbia had a duty to hire sufficient personnel to adequately support the needs of mentally-ill inmates under its care, such as Mr. English.

65.     The District of Columbia had the duty to train and to supervise its employees to meet all of the medical, emotional, and psychological needs of Mr. English.

66.     The District of Columbia breached its duties by:

a.      hiring untrained, insufficiently trained and incompetent staff;

b.      retaining untrained, insufficiently trained and incompetent staff;

c.      failing to adequately train and supervise its employees and personnel;

d.      failing to discipline and/or terminate staff who were falsifying records; and

e.      was otherwise negligent.

67.     As a direct and proximate result of the District of Columbia's negligence, Mr. English suffered injuries and death.

68.     As a direct and proximate result of the District of Columbia's negligence, Mrs. English and the next-of-kin beneficiaries have suffered, and will continue to suffer mental anguish, loss of society, companionship, guidance, kindly offices and advice, and the reasonably expected loss of income and services, protection, care and assistance provided by English, and all other damages recoverable under District of Columbia law.

WHEREFORE, Plaintiff demands judgment against the District of Columbia in the amount of $5 million, and for all other relief deemed just and proper.

## <u>COUNT III</u>
### (NEGLIGENCE PER SE – DISTRICT OF COLUMBIA)

69.     Plaintiff incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

70.     Pursuant to D.C. Code § 24-211.02, the Defendant through its Department of Corrections ("DOC"), had a statutory duty and responsibility for the safekeeping, care and protection of persons committed to the CDF.

71.     Pursuant to D.C. Code § 24-211.02, the DOC with the approval of the Council of the District of Columbia has the power to promulgate rules and regulations for the governance of the CDF regarding classification of inmates and how to provide proper treatment, care, rehabilitation and reformation.

72.     The District of Columbia had a duty to exercise reasonable care in performing these duties.

73.     The District of Columbia represented to the general public and to Mr. English that it would provide professionals that were sufficient in number, properly trained, supervised and equipped to meet the needs of the inmates in the CDF.

74.     CDF policy states that all inmates are to be given a mental-health screening during their intake, and inmates that show signs of potential suicidal or other unusual behavior are to undergo more rigorous analysis and are to be treated with a heightened degree of care.

75.     CDF policy also states that inmates in general population are to be monitored at intervals no less than every thirty minutes, while inmates showing unusual behavior and/or potential suicidal behaviors are to be monitored more closely.  CDF staff while making these rounds are to log accurate information and observations of inmates to determine behavioral changes and risks.

76.     The District of Columbia and its agents/employees acting within the scope of their employment negligently breached their duty of care and protection and negligently provided substandard care to Mr. English in the following manner:

a.   failing to properly provide Mr. English with medication for a serious and known mental illness;

b.   failing to assess Mr. English's mental well-being in a reasonable and timely manner;

c.   failing to place Mr. English in a safe cell on Suicide Watch, or on Suicide Precaution despite his known mental illness, erratic behavior during his incarceration and the expressed concern for his mental well-being from his public defender, Mr. Bikoff;

d.   failing to properly monitor and log observations of Mr. English;

e.   failing to provide adequate medical care, adequate general care and an adequate care plan which would have prevented the reasonably foreseeable death of English;

f.   falsifying documents concerning how often Mr. English was being monitored by CDF staff;

g.   failing to follow accepted and standard medical procedures and safety methods when caring for and supervising Mr. English; and

h.   were otherwise negligent.

77.     As a direct and proximate result of the District of Columbia's negligence, Mr. English suffered injuries and death.

78.     As a direct and proximate result of the District of Columbia's negligence, Mrs. English and the next-of-kin beneficiaries have suffered, and will continue to suffer mental anguish, loss of society, companionship, guidance, kindly offices and advice, and the reasonably expected loss of income and services, protection, care, and assistance provided by English, and all other damages recoverable under District of Columbia law.

WHEREFORE, Plaintiff demands judgment against the District of Columbia in the amount of $5 million, and for all other relief deemed just and proper.

## COUNT IV
## (SURVIVAL ACT – ALL DEFENDANTS)

79.     Plaintiff incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

80.     Plaintiff further alleges that this claim arises under the District of Columbia Survival Statute, D.C. Code § 12-101, *et seq*.

81.     As a direct and proximate result of the negligent and/or wrongful conduct of the Defendants as described above, Michael English is now deceased, but not before experiencing great pain, mental anguish, and suffering.

82.     Mr. English's right of action for the negligent conduct against the Defendants survives in favor of Plaintiff Margaret English, as Personal Representative of the Estate of Michael English.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in the amount of $5 million and for all other relief deemed just and proper.

## COUNT V
## (WRONGFUL DEATH – ALL DEFENDANTS)

83.     Plaintiff incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

84.     As a direct and proximate result of the negligent and/or wrongful conduct of the Defendants, Michael English is now deceased.

85.     As a direct and proximate result of the Defendants' negligence, Mrs. English and the next-of-kin beneficiaries have suffered, and will continue to suffer, mental anguish, loss of society, companionship, guidance, kindly offices and advice, and the reasonably expected loss of income and services, protection, care, and assistance provided by English, and all other damages recoverable under District of Columbia law.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally, in the amount of $5 million, and for all other relief deemed just and proper.

## COUNT VI
## (42 U.S.C. § 1983 VIOLATIONS –DISTRICT OF COLUMBIA)

86.     Plaintiff incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

87.     At all times relevant hereto, Mr. English was a pretrial detainee of the District of Columbia and was completely dependent on the Defendant for his care, protection and well-being.

88.     The District of Columbia, individually and through its agents/employees, deprived Mr. English of his civil rights as set out by the Fifth Amendment to the United States Constitution.

89.     The duty to provide a pre-trial detainee with medical care is non-delegable as pertaining to constitutional rights, and the District of Columbia is therefore responsible for the conduct of any employees, agents, and/or independent contractors to whom it delegates the responsibility for such care.

90.     From October 2012 until Mr. English's death on November 30, 2012, the District of Columbia had a duty and responsibility to provide Mr. English with adequate medical care, including proper provision and monitoring of medication, appropriate behavioral monitoring and care for his known and severe mental illnesses, substantial suicide prevention procedures, and provision of a cell safe for his mental needs.

91.     At the time of Mr. English's suicide, both the DOC and its contractor, Unity, had suicide policies and procedures.

92.     From October 2012 until November 30, 2012, the District of Columbia failed to provide Mr. English with an environment that was safe and adequate to meet his basic mental health needs. This environment included untrained staff that acted intentionally and/or with deliberate indifference by:

    a. maintaining a practice and custom of failing to follow the written protocol of the CDF's and Unity's suicide prevention policies;

    b. placing Mr. English under the unauthorized but customary practice/policy of Behavioral Observation;

    c. failing to monitor and protect Mr. English with knowledge of his severe mental illness;

    d. failing to place Mr. English in a safe cell, on Suicide Watch or on Suicide

Precaution while aware of his serious mental illness and potential signs of suicide risk;

e.  failing to properly provide Mr. English with medication for a serious and known mental illness;

f.  failing to assess Mr. English's mental well-being in a reasonable and timely manner;

g.  falsifying records in an attempt to cover up an intentional and/or deliberate indifference to Mr. English's known and serious mental health needs; and

h.  were otherwise negligent.

93.  The intentional and/or deliberately indifferent treatment of Mr. English was a direct consequence of the policy and custom of the District of Columbia and its employees/agents.

94.  Following the suicide of Michael English and three others, an investigation and report called "The Report on Suicide Prevention Practices Within the District of Columbia, Department of Corrections' Central Detention Facility" was published by Lindsay M. Hayes at the request of Thomas Faust, the director of the DOC.

95.  The findings of that report demonstrate that the District of Columbia had a policy and custom of deliberate indifference at the time of English's death, which violated Mr. English's Constitutional rights as follows:

a.  Despite the DOC Suicide and Prevention Policy (No. 60802F) and Unity Health Care's Suicide Prevention Policy (No. CF705) requiring mandatory training in suicide prevention for all employees and a greater degree of training to those involved in the mental health units, "the totality of suicide prevention training to *all* employees

(including CDF correctional and Unity Health Care staff) was a 39-slide PowerPoint presentation. . . encompassing only one hour;"

       b.     There were/are only nine designated "safe cells" in all of the CDF, which regularly handles more than 1,700 inmates, many of whom suffer mental illnesses. Several of these cells contained dangerous anchoring devices;

       c.     The Mental Health Units were/are understaffed;

       d.     The Behavioral Observation practice within the CDF is especially restrictive, punitive and anti-therapeutic;

       e.     The practice of putting inmates under Behavioral Observation, and under what time intervals they are supposed to be observed, was/is not in writing because Behavioral Observation is not addressed or authorized in either the DOC or Unity Health Care suicide prevention policies;

       f.     Inmate(s) who attempted suicide were put on Behavioral Observation and not Suicide Watch or Precaution;

       g.     "Suicide Watch and Suicide Precaution are rarely utilized in the facility" while Behavioral Observation was/is the customary policy used for monitoring suicidal and violent inmates;

       h.     Behavioral Observation was/is used, at least in part, to evade the written requirement to monitor inmates on Suicide Watch/Precaution at fifteen-minute intervals;

       i.     Defendant had a custom of not taking seriously potential suicidal signs, behaviors and threats; and

j.      Following suicides, there was no corrective-action plan to follow up with post-suicide recommendations.

96.     At the time of Mr. English's death, the policies and practices at the CDF evidenced an intentional and/or deliberate indifference to his severe and known mental illness.

97.     In October and November 2012, the District of Columbia and its employees/agents had a practice and custom of failing to follow the protocol of its suicide prevention policies.   Defendant knew or should have known the extent and use of Behavioral Observation.

98.     Mr. English's death was a direct and proximate result of the District of Columbia policy and custom.

99.     All of the District of Columbia's conduct was under the color of the statutes, ordinances, regulations, customs and usage of the District of Columbia.

100.    The District of Columbia knew or should have known that failing to watch and monitor Mr. English, failing to put him on Suicide Watch/Precaution or place him in a safe cell, and neglecting to properly provide Mr. English with medication constituted a violation of Mr. English's rights under the Fifth Amendment to the United States Constitution.

101.    The District of Columbia's conduct was intentional and/or the product of deliberate indifference to the manifest risk that a violation of Mr. English's constitutional rights would result from its acts.

102.    The District of Columbia's intentional and/or deliberately indifferent conduct is shocking to the conscience, outrageous and amounted to a violation of Mr. English's Fifth Amendment substantive due process rights.

103.    As a direct and proximate result of the Defendant's policy, custom and violations of Mr. English's constitutional rights, Mr. English is deceased and his survivors have suffered severe and substantial damages.

WHEREFORE, Plaintiff demands judgment against the District of Columbia, including exemplary damages, in the amount of $10 million, and for all other relief deemed just and proper.

Respectfully submitted,

PERRY CHARNOFF PLLC


_____/s/_____
Scott M. Perry (#459841)
Mikhael D. Charnoff (#476582)
2300 Wilson Boulevard, Suite 240
Arlington, VA 22201
P: (703) 291-6650
F: (703) 563-6692
scott@PerryCharnoff.com
mike@PerryCharnoff.com
*Counsel for Plaintiff*


## JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by a jury on all issues in this Complaint.


_____/s/_____
Scott M. Perry

19